[No. C008817. Third Dist. July 18, 1991.]

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Plaintiff and Respondent, v.
GEORGE E. MESSINGER et al., Defendants and Appellants.

COUNSEL

Lynn Hubbard III for Defendants and Appellants.

McDonald, Saeltzer, Morris, Creeggan & Waddock, William O. Morris and J. Martin McAllister for Plaintiff and Respondent.

OPINION

DAVIS, J.—

INTRODUCTION

In this insurance coverage dispute, George and Diana Messinger (the Messingers) appeal from a summary judgment in favor of State Farm. This dispute arose out of a two-car collision after the Messingers sought to recover under their automobile underinsurance policy with State Farm payment of damages not covered by the tortfeasor's liability policy. The Messingers alleged that the tortfeasor was underinsured as defined in their insurance policy and that they were each entitled to the full coverage under the policy minus the amounts already paid by the tortfeasor. State Farm denied their underinsurance claim. On appeal, the Messingers contend there are two triable issues of fact: (1) whether the tortfeasor was underinsured as defined in both State Farm's policy and the proper subdivisions of Insurance Code section 11580.2; and (2) whether State Farm's denial of underinsurance coverage violated the liability coverage requirements of Insurance Code

section 11580.2, subdivision (a)(1). (Further references to undesignated sections are to the Insurance Code.) We affirm the summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On November 2, 1986, Georgette Sehn and Diana Messinger were passengers in a car driven by George E. Messinger. Their car was travelling in Butte County when it collided with a car driven by John Lee Ballard. As a result of the collision, the two Messingers and Sehn were injured.

At the time of the accident, George Messinger had an automobile insurance policy with State Farm. The policy contained bodily injury limits for uninsured/underinsured motorist coverage in the amounts of $100,000 per person and $300,000 per accident.

The tortfeasor, John Lee Ballard, carried bodily injury liability insurance on his vehicle with an aggregate single limit of $300,000. Ballard's policy was issued by Aetna Casualty & Surety Company (Aetna).

Shortly after the accident, the Messingers and Sehn made a claim against Ballard's Aetna policy. Aetna settled with the Messingers and Sehn for the full amount of the policy ($300,000). Aetna paid $290,000 to Sehn and $5,000 each to the Messingers. The Messingers and Sehn agreed to this distribution. In this settlement, the Messingers and Sehn were represented by the same attorney. Through that attorney, they notified State Farm in writing of the terms of the settlement and requested State Farm's permission to settle.

The Messingers sought State Farm's permission in accordance with the terms of their underinsured motorist coverage which required such action in order to protect their underinsured motorist claim. State Farm responded that it did not believe its permission was necessary to the settlement since the Messingers and Sehn were not entitled to underinsured motorist benefits under the State Farm policy. State Farm informed the Messingers' attorney that Ballard's car was not an "underinsured motor vehicle" because it was insured for a $300,000 limit, which was the same amount of insurance carried on the Messingers' car. Nevertheless, State Farm gave the Messingers and Sehn "permission" to settle but stated it was not consenting to or approving the proposed distribution of proceeds.

When State Farm continued to deny coverage, the Messingers filed suit. State Farm in turn filed a declaratory relief action and then moved for summary judgment, relying on the definition of an underinsured car and the setoff provisions for compensation received by the insured from the

tortfeasor's liability policy. The trial court granted the summary judgment, and the Messingers filed a timely notice of appeal.

## DISCUSSION

■ This case involves the interpretation of an insurance policy and certain statutes in the context of stipulated facts. As such, the case presents questions of law which we review de novo on appeal. (*State Farm Fire & Casualty Co.* v. *Lewis* (1987) 191 Cal.App.3d 960, 963 [236 Cal.Rptr. 807]; *Rudd* v. *California Casualty Gen. Ins. Co.* (1990) 219 Cal.App.3d 948, 951-952 [268 Cal.Rptr. 624]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 241-242, pp. 246-247.) ■ A motion for summary judgment is an appropriate procedure by which to determine such issues of law. (6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 277, p. 578; *Burke Concrete Accessories, Inc.* v. *Superior Court* (1970) 8 Cal.App.3d 773, 774-775 [87 Cal.Rptr. 619].)

### 1. *Is There Underinsurance Coverage Here?*

The first issue we consider is whether the Messingers' underinsurance coverage even applies to the collision involving Ballard.

In California, the applicability of underinsurance coverage is governed by section 11580.2, subdivision (p), which states that such coverage "applies only when bodily injury . . . is caused by an underinsured motor vehicle." Consistent with section 11580.2, subdivision (p), the Messingers' insurance policy with State Farm provides that underinsurance coverage applies only if bodily injury damages are caused by an "underinsured motor vehicle."

Section 11580.2, subdivision (p)(2), defines "underinsured motor vehicle" as follows: " 'Underinsured motor vehicle' means a motor vehicle that is an insured motor vehicle but insured for an amount that is less than the uninsured motorist limits carried on the motor vehicle of the injured person."[1] Consistent with section 11580.2, subdivision (p)(2), the Messingers' insurance policy defines "underinsured motor vehicle" as a "land motor

---

[1] Under section 11580.2, subdivision (n), uninsured and underinsured motorist coverage in California is offered as a single coverage. It is for this reason that section 11580.2, subdivision (p)(2), refers merely to "uninsured motorist limits." Nevertheless, under section 11580.2, subdivision (n), an insurer may offer underinsurance coverage at limits above uninsurance coverage. As we shall see, if an insured purchases underinsurance coverage at limits above uninsurance coverage, case law as well as logic and common sense dictate that the definition of an "underinsured motor vehicle" is determined by comparing that vehicle's insurance limits with the underinsurance coverage limits. (See *Malone* v. *Nationwide Mutual Ins. Co.* (1989) 215 Cal.App.3d 275, 278-279 [263 Cal.Rptr. 499].) We note that the definition of "underinsured motor vehicle" in the subject State Farm policy is in accord with this principle.

vehicle, the ownership, maintenance, or use of which is: [¶] (1) Insured or bonded for bodily injury liability at the time of accident, but [¶] (2) the limits of liability are less than the limits of liability of this coverage."

■ The meaning of such words is clear. Underinsurance coverage does not apply unless the tortfeasor's vehicle is an underinsured motor vehicle. An underinsured motor vehicle, by definition, is a vehicle insured for an amount that is *less* than the uninsured/underinsured motorist limits carried by the injured person. Thus, if the tortfeasor is insured for an amount equal to or greater than the uninsured/underinsured limits of the injured person, that person never gets to collect any underinsurance coverage. This is the type of scenario we have in this case.

The tortfeasor (Ballard) was insured for a limit of $300,000 for all injuries arising out of an accident. The Messingers had uninsured/underinsured limits of $100,000 for injuries to one person and $300,000 for all injuries arising out of an accident. By simply comparing Ballard's limits ($300,000) with the Messingers' limits ($300,000), it is clear that Ballard's car was not an underinsured motor vehicle as defined by the Insurance Code and the Messingers' insurance policy. Ballard's car was insured for an amount *equal* to the uninsured/underinsured coverage the Messingers carried, and therefore not "an amount *less* than the uninsured/[underinsured] motorist limits carried" by the Messingers. (§ 11580.2, subd. (p)(2); italics added.) Accordingly, the Messingers' underinsurance coverage—drafted in language conforming to section 11580.2, subdivision (p)(2)—was never triggered and they were never entitled to collect *any* underinsurance amount from State Farm. (*Elwood* v. *Aid Ins. Co.* (9th Cir. 1989) 880 F.2d 204, 207-208; and see *Rudd* v. *California Casualty Gen. Ins. Co.*, *supra*, 219 Cal.App.3d at p. 955, fn. 8.)

The Messingers rely on two provisions in their policy to argue that their underinsurance coverage was not triggered until they received payment from Ballard, the tortfeasor, at which time it could be determined that Ballard's payments to them were below their per person underinsurance limits.

Specifically, these two provisions define the extent of State Farm's liability pursuant to underinsurance coverage as follows: (1) "If the damages are caused by an *underinsured motor vehicle*, there is no coverage until: [a] The limits of liability of all bodily injury liability bonds and policies that apply have been used up by payment of judgments or settlements to other *persons*; or [b] Such limits of liability or remaining part of them have been offered to the *insured* in writing."; and (2) "The amount of coverage is shown on the declarations page under 'Limits of Liability—U—Each Person, Each

Accident.' Under 'Each Person' is the amount of coverage for all damages due to *bodily injury* to one *person* . . . . Under 'Each Accident' is the total amount of coverage, subject to the amount shown under 'Each Person', for all damages due to *bodily injury* to two or more *persons* in the same accident . . . [¶] If the damages are caused by an *underinsured motor vehicle*, the most we will pay will be the lesser of: (a) The difference between the limits of liability of this coverage and the amount paid to the *insured* by or for any *person* or organization who is or may be held legally liable for the *bodily injury* ; or (b) The difference between the amount of the *insured's* damages for *bodily injury*, and the amount paid to the *insured* by or for any *person* or organization who is or may be held legally liable for the *bodily injury*." (Italics in original.)

In essence, the Messingers argue that the policy provision stating when underinsurance coverage takes effect (policy provision (1) above; premised upon section 11580.2, subd. (p)(3)) dictates that their underinsurance coverage was not "triggered" until Ballard's insurer had paid its policy limits. According to the Messingers, when the last dollar was paid under the Ballard policy to them, the limits of liability on that policy became less than the limits of liability on the Messinger policy and their underinsurance coverage was therefore triggered.

Thereafter, the Messingers contend, State Farm was obligated to pay each of them $100,000 minus the $5,000 each had already received. They arrive at this amount of coverage by "clarifying" the "somewhat confusing" definition of "underinsured motor vehicle." This clarification involves combining policy provision (1) and the policy definition of "Each person coverage" into the definition of "underinsured motor vehicle."[2]

The result of this puzzling and convoluted process is to make underinsurance coverage available when "the amount of coverage for all damages due to bodily injury to one person are [*sic* ] less than the limits of liability of this coverage." Accordingly, the Messingers contend, after Ballard's insurer paid $290,000 to Sehn and $5,000 apiece to them, State Farm became indebted to them for $95,000 apiece, the difference between Ballard's (the underinsured's) payment to them and their underinsured per person coverage of $100,000.[3] We do not agree with plaintiff's "construction" of State Farm's coverage provisions.

---

[2]"Each person coverage" is defined as "the amount of coverage for all damages due to bodily injury to one person."

[3]Sehn does not make any claim against State Farm in the present case. Sehn was included as an "insured" under the Messinger policy because that term encompasses "any other person while occupying [the Messinger] car." This is in accord with section 11580.2, subdivision (b),

There are two basic problems with the Messingers' argument. First, the definition of "underinsured motor vehicle," as we have seen, is clear rather than "somewhat confusing." Consequently, there is no need to clarify the definition. Secondly, the two provisions cited by the Messingers come into play only after it has been determined that bodily injury has been caused by an underinsured motor vehicle. The Messingers fail to notice the language in both provisions which states: "If the damages are caused by an *underinsured motor vehicle . . . .*" (Italics in original.) This language is again consistent with the introductory language of section 11580.2, subdivision (p), which states that underinsurance coverage "applies only when bodily injury . . . . is caused by an underinsured motor vehicle . . . ." Implicit in the conditional language of both provisions is the fact that the tortfeasor's vehicle has been determined to be underinsured. Unless the tortfeasor's vehicle is "underinsured," one does not go to the next step and determine how much compensation the injured insured will receive pursuant to his or her underinsurance coverage. In the situation presented here, we never get to determine the amount of the Messingers' underinsurance coverage because Ballard's car was not "underinsured" and therefore such coverage was not even triggered. (See *Elwood* v. *Aid Ins. Co., supra,* 880 F.2d at pp. 207-208; *Malone* v. *Nationwide Mutual Ins. Co.* (1989) 215 Cal.App.3d 275, 279 [263 Cal.Rptr. 499].) While there is no final published decision from a California court directly on point, decisions from several other courts support our position.[4]

In *Elwood* v. *Aid Ins. Co., supra,* 880 F.2d 204, the Ninth Circuit construed an insurance policy containing underinsurance provisions similar to those in the State Farm policy and in accord with section 11580.2. (880 F.2d at pp. 205-206.) There, the Elwoods' underinsurance limits equalled the tortfeasor's liability limits. (*Id.* at p. 205.) The *Elwood* court concluded that the underinsurance coverage "was never triggered because [the tortfeasor's] vehicle did not meet the definition of an 'underinsured motor vehicle.'" (*Id.* at p. 209.)

In *Rudd, supra,* 219 Cal.App.3d 948, the issue was whether workers' compensation benefits could be offset against underinsurance coverage. The

---

which provides in pertinent part that "the term 'insured' means the named insured and . . . any other person while in or upon . . . an insured motor vehicle . . . ."

[4]In a split decision filed April 30, 1991, the Fourth Appellate District determined that the language of section 11580.2, subdivision (p)(2) is clear and therefore underinsurance coverage did not apply in that case because the insured's underinsurance limits equalled the tortfeasor's liability limits. (*Schwieternan* v. *Mercury Cas. Co.* (1991) 229 Cal.Rptr. 1044 [280 Cal.Rptr. 804].) The dissent noted that pursuant to section 11580.2, subdivision (p)(2), underinsurance coverage in the statutory minimum limits of $15,000/30,000 theoretically cannot exist; this issue is not involved here because the Messingers' underinsurance coverage was for $100,000/300,000. The dissent also raised the problem of multiple insureds, an issue we discuss later in this opinion.

court in dictum, however, stated that "[t]he underinsurance provisions and coverages only apply when the injury is caused by an 'underinsured motor vehicle' (§ 11580.2, subd. (p)), defined as a vehicle which carries insurance 'for an amount that is less than the uninsured motorist limits carried on the motor vehicle of the injured person.' (§ 11580.2, subd. (p)(2).) Hence, where the tortfeasor carries an equal level of insurance, the underinsurance coverage has no application." (*Id.* at p. 955, fn. 8.)

Two out-of-state cases—*Tyler* v. *N. J. Auto. Full Ins.* (1988) 228 N.J.Super. 463 [550 A.2d 168] and *Cossitt* v. *Federated Guar. Mut. Ins. Co.* (Miss. 1989) 541 So.2d 436—have interpreted underinsurance statutes similar to section 11580.2, subdivision (p)(2), and have reached decisions in accord with our conclusion.

In *Tyler*, four members of the Tyler family collided with a tortfeasor who carried liability insurance of $25,000 per person and $50,000 per accident. At the time, the Tylers had an insurance policy with uninsured/underinsured motorist coverage of $15,000 per person and $30,000 per accident. The tortfeasor's carrier offered the per accident limit of $50,000 in settlement and the Tylers accepted it, dividing the proceeds as follows: $19,000 to one, $16,500 to another, $9,500 to a third, and $5,000 to the fourth injured Tyler. (550 A.2d at pp. 169-170.) Thereafter, the two Tylers who had settled for $9,500 and $5,000 made a claim against their underinsurance coverage. These two Tylers claimed their $15,000 per person underinsurance coverage entitled them to the difference between the amounts received from the tortfeasor ($9,500 and $5,000) and their underinsurance coverage, so that they were entitled to $5,500 and $10,000 respectively.

At issue in *Tyler* was the interpretation of New Jersey Finance and Insurance Code section 17:28-1.1, subdivision (e) (N.J. Stat. Ann. § 17:28-1.1, subd. (e) (West Supp. 1990) p. 60). Under that statute, a vehicle is deemed underinsured when: ". . . the sum of the limits of liability under all bodily injury and property damage liability bonds and insurance policies available to a person against whom recovery is sought for bodily injury or property damage is, at the time of the accident, less than the applicable limits for underinsured motorist coverage afforded under the motor vehicle insurance policy held by the person seeking that recovery. A motor vehicle shall not be considered an underinsured motor vehicle under this section unless the limits of all bodily injury liability insurance or bonds applicable at the time of the accident have been exhausted by payment of settlements or judgments. The limits of underinsured motorist coverage available to an injured person shall be reduced by the amount he has recovered under all

bodily injury liability insurance or bonds."[5] (*Id.* at p. 61; see 550 A.2d at pp. 169-170.)

Construing the language of this statute, the *Tyler* court noted: "The plain meaning of the statute is that underinsured motorist benefits are available if (and to the extent that) the tortfeasor's liability limits are lower than the limits of the underinsured motorist coverage contained in the plaintiffs' policy. Here, the tortfeasor's liability limits were $25,000/$50,000 while plaintiffs' underinsured motorist limits were $15,000/$30,000. For that reason, plaintiffs' underinsured motorist coverage did not apply." (*Tyler, supra,* 550 A.2d at p. 170.)

The court in *Tyler* went on to state that the statute would produce the same result whether there was one injured claimant or many, or if the amount of damages exceeded the tortfeasor's liability limits, or even if multiple claims against one tortfeasor were settled for individual amounts that were less than the underinsured motorist coverage available to the individual under his or her policy. (*Tyler, supra,* 550 A.2d at p. 170.) The key language in that decision stated: "A tortfeasor is not underinsured relative to plaintiff's damages, or relative to the judgment or judgments against him, but rather relative to the limits of the underinsured motorist coverage purchased by or for the person seeking recovery." (*Ibid.*)

Similar to the Tylers and the Elwoods, the Messingers' underinsurance coverage was never triggered because the bodily injury liability limit on Ballard's car was not less than the Messingers' underinsurance limit. (§ 11580.2, subd. (p)(2).) Since Ballard's car carried the same limits as the Messingers' car, Ballard's car was not underinsured.[6]

---

[5]This language is similar to section 11580.2, subdivisions (p)(2), (3) and (4).

[6]Similarly, Mississippi, like California, has statutorily enacted an underinsurance provision that compares the relevant limits of the tortfeasor and the injured person in order to determine whether underinsurance coverage applies. (Miss. Code Ann., § 83-11-103, subd. (c)(iii) (1990 pocket supp.) p. 126.) This statute, somewhat like section 11580.2, subdivision (n), subsumes the term "underinsured" within the term "uninsured." In *Cossitt*, the Supreme Court of Mississippi interpreted this statute. In that case, the tortfeasor had bodily injury limits equal to the injured person's underinsured motorist coverage, but these limits were exhausted by two other claimants who had also been involved in the accident. (541 So.2d at p. 438.) Denying Cossitt's claim that she was entitled to uninsured benefits under her policy because there was no amount left over for her to collect, the court stated: ". . . the focus in determining whether the tortfeasor is uninsured is on the respective 'limits' of the policies. 'Mississippi law defines an [un]insured motor vehicle in terms of policy limits, as distinguished from proceeds actually received by a particular claimant,' . . . it appears clear under the statutory definition that the tortfeasor in this case is not uninsured as to Cossitt since the limit of liability provided by his insurer is not less than the limit provided by Cossitt's own uninsured motorist coverage." (541 So.2d at p. 440.)

## 2. The Nature of California's Underinsurance Law

The Messingers end their discussion of when underinsurance coverage is triggered by arguing that in any event, the language in the insurance policy provisions at issue is uncertain and ambiguous. Relying on well-settled principles of insurance contract interpretation, the Messingers contend that when there is uncertain language, the issue is resolved against the insurer and in favor of achieving the policy's purpose of indemnification. Additionally, argue the Messingers, words are to be interpreted according to their ordinary meaning, and exclusionary clauses must be conspicuous, plain and clear. (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115-116 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; see *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807-808 [180 Cal.Rptr. 628, 640 P.2d 764]; *Elwood* v. *Aid Ins. Co., supra*, 880 F.2d at pp. 207-208.)

The first problem for the Messingers is that we have determined there is no underinsurance coverage in this case because the definition of "underinsured motor vehicle" set forth in the Messingers' insurance policy with State Farm is plain and clear. We add now that the definition is also set forth conspicuously. (See *Elwood* v. *Aid Ins. Co., supra*, 880 F.2d at pp. 207-208.) This unambiguous definition is authorized by and conforms to the language of section 11580.2, subdivision (p)(2). This statutory conformance raises a second problem for the Messingers.

■ Although it is generally true that an ambiguity in an insurance policy is construed against the insurer who causes the ambiguity, where the language is that of the Legislature, this principle does not apply. (*Interinsurance Exchange* v. *Marquez* (1981) 116 Cal.App.3d 652, 656 [172 Cal.Rptr. 263].) In such situations, "the statute [and, hence, the insurance policy provision in conformity therewith] must be construed to implement the intent of the Legislature and should not be construed strictly against the insurer . . . ." (*Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674, 684 [274 Cal.Rptr. 387, 798 P.2d 1230].)

■ In interpreting the intent of the Legislature, we must do so in a way that effectuates the purpose of the law. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) To ascertain such intent, we must first examine the words of the statute itself (*ibid.*), and give those words their usual and ordinary meaning. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute (*West Pico Furniture Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 608 [86 Cal.Rptr. 793, 469 P.2d 665]); where possible,

the language should be read so as to conform to the spirit of the enactment. (*Lungren* v. *Deukmejian, supra*, 45 Cal.3d at p. 735.)

With these principles in mind, we evaluate the Legislature's intent and purpose in drafting California's underinsurance law. (§ 11580.2, subds. (n), (p), (q).)

Underinsurance coverage was made a mandatory provision of every automobile bodily injury liability policy issued or renewed on or after July 1, 1985. (§ 11580.2, subd. (p)(7).) Such coverage must at least equal the limits of liability of the insured's uninsured motorist coverage. (§ 11580.2, subd. (n).) While uninsured and underinsured motorist coverage is to be offered as a single coverage, the carrier may offer underinsured coverage with limits higher than those for uninsured coverage. (*Ibid.*) By its provisions, the State Farm policy issued to the Messingers fully complied with these statutory requirements.

Underinsured motorist insurance developed as a result of the perceived inadequacies of uninsured motorist insurance. Many times victims would suffer substantial damages at the hands of a tortfeasor who, although insured, could not provide adequate compensation because of low liability limits. (2 Widiss, Uninsured and Underinsured Motorist Insurance (2d ed. 1990) Pt. III, §§ 31.1-31.6, pp. 3-9; hereafter Widiss.) As a result, many states passed statutes making underinsurance coverage a mandatory part of motor vehicle insurance. Along the way, the various states had to choose to what extent they wanted to indemnify the insured for damages that went uncompensated by the tortfeasor. The distinctions are sometimes blurred from state to state but basically two general views of underinsurance coverage have developed. (*Ibid.*)

One view focuses on providing coverage to the accident victim for all damages that go uncompensated after the tortfeasor has paid over its limits. (Widiss, *supra,* at § 32.2.) Termed "broad coverage," this view adopts the belief that underinsured motorist coverage is not merely a stop-gap measure to cure the deficiencies of existing uninsured schemes, but is intended to indemnify injured parties for uncompensated damages. (Note, *A Motorist is Underinsured Under Texas Insurance Code Article 5.06-1(2)(b) Whenever His Liability Insurance Proceeds are Insufficient to Compensate for the Injured Party's Actual Damages* (1990) 21 Texas Tech. L.Rev. 2249, 2257; hereafter, Texas Tech. L.Rev. Note.) The "broad coverage" view defines a tortfeasor as underinsured whenever his available liability insurance proceeds are less

than the injured party's actual damages. "Broad Coverage" seeks to provide full indemnification. (*Ibid.*)[7]

The second or "narrow coverage" view focuses on placing the insured in the position he or she would have been in if the underinsured motorist had had liability coverage equal to the insured's underinsured motorist limits. Under this view, the purpose of underinsurance is only to fill the vacuum left by the traditional uninsured motorist coverage. This view denies any underinsurance coverage to the insured if the tortfeasor's liability limits are equal to or greater than the insured's underinsured coverage. (Texas Tech. L.Rev. Note, *supra*, at p. 2258.)[8]

In California, underinsurance coverage is not triggered by the amount of the injured person's damages or by the proceeds available to each injured person, but by a comparison of the tortfeasor's bodily injury liability limits with the injured person's underinsurance limits. (§ 11580.2, subd. (p); see Note, *Interpreting the Recently Enacted California Underinsurance Provisions of the Uninsured Motorist Statute* (1987) 14 Pepperdine L.Rev. 691, 694-695.) Accordingly, California has chosen to follow the "narrow coverage" view in enacting its underinsurance provisions. (See *Rudd* v. *California Casualty Gen. Ins. Co., supra,* 219 Cal.App.3d at pp. 954-955; *Malone* v. *Nationwide Mutual Ins. Co., supra,* 215 Cal.App.3d at p. 279.)

A central feature of California's underinsurance scheme is that it "permit[s] individuals to purchase insurance for themselves in an amount they deem appropriate." (*Malone, supra,* 215 Cal.App.3d at p. 279; see § 11580.2, subds. (m) and (n).) As noted in *Rudd, supra,* 219 Cal.App.3d at pages 954-955, California's underinsurance scheme is designed to permit "a responsible driver to protect himself against . . . minimally insured tortfeasors by purchasing, for his own protection, the insurance which the tortfeasor declined to purchase." *Rudd* continues: ". . . the fundamental purpose of section 11580.2 [governing both uninsurance and underinsurance coverage] is to provide the insured with the same insurance protections he would have enjoyed if the adverse driver had been properly insured." (*Id.* at p. 954.) Section 11580.2 was never designed to place the insured "in a *better* position than he would have occupied had the other driver carried such insurance." (219 Cal.App.3d at p. 954, italics in original.)

With these policy considerations in mind, we decline to adopt the Messingers' reasoning in extending coverage to their situation. In

---

[7]For states that follow this view, see 3 Schermer, Automobile Liability Insurance (2d ed. 1990 rev.) §§ 35.02, 35.02[2]; (hereafter Schermer).

[8]See Schermer at section 35.05[1] for the states, including California, which are grouped under this definition.

determining the applicability of underinsurance coverage, the focus of section 11580.2 is not on the amount of damages incurred or the amount of damages uncompensated. Rather, section 11580.2 affords underinsurance coverage only if the insured was injured by a driver with insurance limits lower than those the insured had chosen in contracting with his or her insurance company.

The Messingers argue that section 11580.2, subdivision (p) does not provide adequate coverage for accidents involving multiple victims. Even if the Messingers' point were well taken, they have presented it to the wrong forum. Their criticism must be directed to the Legislature. All we can do is interpret the statute as written. (See *Cossitt* v. *Federated Guar. Mut. Ins. Co.*, *supra*, 541 So.2d at p. 442.) As written, section 11580.2, subdivision (p)(2) states that underinsurance coverage is not even triggered unless the tortfeasor's vehicle is insured for an amount less than the underinsurance limits of the injured person. (See *Rudd* v. *California Casualty Gen. Ins. Co.*, *supra*, 219 Cal.App.3d at p. 955, fn. 8; § 11580.2, subd. (n).) As written, the focus of section 11580.2, subdivision (p)(2) is on these insurance limits rather than on the proceeds available to each injured person. ■ "When a clause in an insurance policy is authorized by statute, it is deemed consistent with public policy as established by the Legislature." (*Prudential-LMI Com. Insurance* v. *Superior Court, supra*, 51 Cal.3d at p. 684.)

Under section 11580.2, subdivision (n), the Messingers could have chosen to increase their underinsurance limits so that they would have been compensated in this unfortunate situation. Neither the purpose nor the language of section 11580.2 allows us to adopt the Messingers' reasoning. ■ If we were to look at how much the Messingers received from Ballard to determine if their underinsurance coverage applied, we would contradict not only the specific language of section 11580.2, subdivision (p)(2), but also the policy considerations of that section; in effect we would be adopting the broad coverage view, which is not what the Legislature intended.[9]

---

[9]The trial court ruled in effect that even assuming Ballard's car was an underinsured motor vehicle, the setoff provisions of section 11580.2, subdivisions (p)(4) and (p)(5), coupled with Sehn's status as an insured under the policy, reduced any award to the Messingers to zero. Because we have upheld the summary judgment on the legal conclusion that Ballard's car was not an underinsured vehicle, we do not express any views on the set off issue. (See, e.g., *Fillippatos* v. *Selective Ins. Co.* (1990) 241 N.J.Super. 236 [574 A.2d 1002].)

The Messingers also claim that State Farm violated section 11580.2, subdivision (a)(1) by unlawfully providing underinsurance coverage below the minimum level of $15,000 per person as required by section 11580.2, subdivision (m) and Vehicle Code section 16056. The Messingers argue that in receiving only $5,000 apiece from the tortfeasor, State Farm has violated these code provisions. We are not persuaded. The Messingers' underinsurance coverage was well above statutory minimums but, for the reasons explained, did not apply because they did not collide with an underinsured car. Ballard's car was insured for the same

## DISPOSITION

The judgment is affirmed.

Carr, Acting P. J., and Nicholson, J., concurred.

.

---

amount as the Messingers' car. The Messingers chose to divide the Ballard insurance proceeds of $300,000 in a manner that left them with only $5,000 apiece while passenger Sehn received $290,000.