[No. C013826. Third Dist. July 26, 1993.]

VIKING INSURANCE COMPANY, Plaintiff and Respondent, v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
Defendant and Appellant.

## COUNSEL

Moss & Enochian, Larry B. Moss and Mark D. Norcross for Defendant and Appellant.

McKinley, Gay & Keitges and William C. Seiffert for Plaintiff and Respondent.

## OPINION

**DAVIS, Acting P. J.**—In this insurance coverage dispute, State Farm Mutual Automobile Insurance Company (State Farm) appeals from a judgment in favor of Viking Insurance Company (Viking). The issue on appeal is whether under California law an underinsurance carrier, faced with claims from several insureds arising from one accident, can offset from the amount it owes to one of these insureds the amount that has been paid to the other insureds under the underinsured motorist's per accident liability policy. We interpret the relevant statutes and conclude they contemplate such an offset. We also interpret the relevant insurance policy and conclude it is in accord with such an offset. Consequently, we affirm the judgment.

### BACKGROUND

The facts are undisputed. In August of 1990, Marie Peralsky, driving her own car, collided with a car driven by Robert Hill and owned by Michael Farley. Peralsky was insured by Farmers Insurance Group (Farmers) for bodily injury liability limits of $15,000 per person and $30,000 per accident. Farley, who was a passenger in his own car along with six others besides Hill, was insured by Viking for underinsured motorist limits of $25,000 per person and $50,000 per accident. Because Peralsky's liability limits were less than Farley's underinsurance limits, Peralsky was considered an "underinsured" motorist relative to Farley and therefore Farley's underinsured motorist coverage was triggered. (Ins. Code, § 11580.2, subd. (p)(2); all further references to a section will be to this code unless otherwise indicated); *Hartford Fire Ins. Co.* v. *Macri* (*Macri*) (1992) 4 Cal.4th 318, 328

[14 Cal.Rptr.2d 813, 842 P.2d 112]; *State Farm Mut. Auto. Ins. Co.* v. *Messinger (Messinger)* (1991) 232 Cal.App.3d 508, 513-518 [283 Cal.Rptr. 493].)

All eight people in Farley's car, including Hill and Farley, were insured persons under Farley's underinsurance coverage with Viking. (§ 11580.2, subd. (b)—pursuant to this subdivision, the term "insured" for underinsurance coverage purposes includes "the named insured . . . and any other person while in or upon or entering into or alighting from" a motor vehicle with underinsurance coverage; the Viking policy is in accord with this subdivision.)

Peralsky's insurer, Farmers, paid its per accident bodily injury liability limits of $30,000 to the occupants of Farley's car except for Hill. Viking paid the sum of $20,000 to these same folks pursuant to Farley's underinsurance coverage, contending this sum represented its maximum liability under such coverage: the $50,000 per accident underinsurance limit reduced by the $30,000 paid by Farmers.[1]

Hill did not receive any of the Farmers liability proceeds or any of the Viking underinsurance proceeds. The parties stipulated that Hill would have been entitled to some of these proceeds had he requested them. However, Hill did not waive any claim to the $30,000 in underinsurance coverage not tendered by Viking. Hill has underinsurance coverage with State Farm, and this coverage is in excess to that provided Hill under the Viking policy. State Farm settled with Hill for $25,000 and now claims reimbursement out of the $30,000 not tendered by Viking under Farley's $50,000 underinsurance limits.[2]

## DISCUSSION

### 1. *The Relevant Statutes*

The issue here is whether Viking is correct that its payment of $20,000 in underinsurance benefits represents its maximum liability under

---

[1]Under court supervision, these sums were allocated to the Farley passengers pursuant to their stipulation with each other and with Hill.

Viking also paid Farley's per accident bodily injury liability limits of $50,000 to the passengers in Farley's car. The parties stipulated that Hill and Farley, however, were not entitled to collect under this coverage. (See § 11580.1, subd. (c)(5).)

[2]Procedurally, this matter arose when Viking filed a complaint in interpleader and for declaratory relief against Peralsky, Farmers, Hill, State Farm and the occupants of Farley's vehicle. State Farm answered this complaint in March 1992. On April 15, 1992, the trial court approved a stipulated settlement, subsequently reduced to judgment, which resolved all claims other than the issue presented by this appeal.

the California underinsurance statutory scheme as applied to the facts in this case. Viking arrives at the $20,000 figure by taking its $50,000 per accident underinsurance limits with Farley and subtracting therefrom the $30,000 per accident liability limits paid by Peralsky's insurer, Farmers. This issue requires that we interpret and apply the underinsurance offset provisions found in section 11580.2, subdivision (p)(4) and (p)(5), to the undisputed facts here. ■ The interpretation and application of a statutory scheme to an undisputed set of facts presents a question of law that we determine independently on appeal. (*Rudd* v. *California Casualty Gen. Ins. Co.* (*Rudd*) (1990) 219 Cal.App.3d 948, 951 [268 Cal.Rptr. 624].)

In interpreting this statutory scheme, we are guided by some well-settled, general principles. ■ "Our function is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. To ascertain such intent, courts turn first to the words of the statute itself, and seek to give the words employed by the Legislature their usual and ordinary meaning. When interpreting statutory language, we may neither insert language which has been omitted nor ignore language which has been inserted. The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute, and where possible the language should be read so as to conform to the spirit of the enactment." (*Rudd, supra,* 219 Cal.App.3d at p. 952, citations omitted.)

■ " 'It is fundamental that legislation should be construed so as to harmonize its various elements without doing violence to its language or spirit. Wherever possible, potentially conflicting provisions should be reconciled in order to carry out the overriding legislative purpose as gleaned from a reading of the entire act. [Citation.] A construction which makes sense of an apparent inconsistency is to be preferred to one which renders statutory language useless or meaningless.' " (*Macri, supra,* 4 Cal.4th at p. 326, quoting *Wells* v. *Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217].)

Turning to the words of the statutes at issue, section 11580.2, subdivision (p)(4) provides: "When bodily injury is caused by one or more motor vehicles, whether insured, underinsured, or uninsured, the maximum liability of the insurer providing the underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury." And section 11580.2, subdivision (p)(5) states: "The insurer paying [an underinsurance] claim . . . shall, to the extent of the payment, be entitled to reimbursement or credit in the amount received by

the insured from the owner or operator of the underinsured motor vehicle or the insurer of the owner or operator." Under section 11580.2, subdivision (b), "insured" includes the "named insured . . . and any other person while in or upon or entering into or alighting from an insured motor vehicle . . . ."[3]

The legislative purpose regarding the underinsured motorist provisions of section 11580.2 has been noted in a variety of recent cases. As this court explained in *Messinger, supra,* 232 Cal.App.3d 508, 514, two general views of underinsurance coverage have developed nationwide. One view focuses on the amount of the injured insured's damages. Termed "broad coverage" or the "make whole" variety, this view "defines a tortfeasor as underinsured whenever his available liability insurance proceeds are less that the injured party's actual damages. 'Broad coverage' seeks to provide full indemnification. [Citation.]" (*Id.* at pp. 520-521; *Fagundes v. American Internat. Adjustment Co. (Fagundes)* (1992) 2 Cal.App.4th 1310, 1315 [3 Cal.Rptr.2d 763]; *Macri, supra,* 4 Cal.4th at p. 328.) This view, then, "focuses on providing coverage to the accident victim for all damages that go uncompensated after the tortfeasor has paid over its limits. [Citation.]" (*Messinger, supra,* 232 Cal.App.3d at p. 520.)

The other view, which California follows, focuses on the amount of the underinsured tortfeasor's bodily injury liability limits. Termed "narrow coverage" or the "offset" variety, this view "focuses on placing the insured in the position he or she would have been in if the underinsured motorist had had liability coverage equal to the insured's underinsured motorist limits. Under this view, the purpose of underinsurance is only to fill the vacuum left by the traditional uninsured motorist coverage. This view denies any underinsurance coverage to the insured if the tortfeasor's liability limits are equal to or greater than the insured's underinsured coverage. [Citation.]" (*Messinger, supra,* 232 Cal.App.3d at p. 521; *Fagundes, supra,* 2 Cal.App.4th at p. 1315; *Macri, supra,* 4 Cal.4th at p. 328.) Thus, California's focus on the tortfeasor's liability coverage restricts the availability of underinsurance coverage even where the injured insured suffers uncompensated damages. (*Macri, supra,* 4 Cal.4th at p. 328; Schmidt, *Interpreting the Recently Enacted California Underinsurance Provisions of the Uninsured Motorist Statute* (1987) 14 Pepperdine L.Rev. 691, 694-695.)

Stated another way, "[t]he California uninsured/underinsured statutes are the 'offset' variety, in which the limit payable is *reduced* by all the amounts

---

[3]All further references to subdivisions will be to subdivisions within section 11580.2 unless otherwise indicated.

received from other sources. Other states have statutes of the 'make whole' variety, in which payment of the policy limits in *addition* to all funds received from any third parties may be necessitated if the insured's damages equal or exceed such amounts." (*Fagundes, supra,* 2 Cal.App.4th at p. 1315; italics in original.)

In short, "the fundamental purpose of section 11580.2 is to provide the insured with the same insurance protections he would have enjoyed" had the "tortfeasor carried liability limits equal to [i]nsured's underinsured motorist limits." (*Rudd, supra,* 219 Cal.App.3d at pp. 954-955.) "Section 11580.2 is not designed to place the insured in a *better* position than he would have occupied had the other driver carried such insurance." (*Id.* at p. 954; italics in original.)

To achieve this fundamental purpose, as our high court has noted, the insurer's entitlement to reimbursement or credit under subdivision (p)(5) in the amount received by the insured from the underinsured tortfeasor or his or her insurer "is the *foundation* of section 11580.2[, subdivision] (p). '[U]nderinsured motorist coverage is not the equivalent of full excess coverage. ▮ As the statutory scheme is designed, the underinsured motorist carrier gets a dollar-for-dollar credit for all payments by third party tortfeasors to the insureds, whether the insureds are made whole or not. In other words, a carrier providing underinsured motorist benefits *never* pays the full amount, only the difference between the policy limits and all contributions by all tortfeasors to all insureds.' " (*Macri, supra,* 4 Cal.4th at p. 328; italics added to "foundation," and in original as to "never"; quoting with approval *Malone v. Nationwide Mutual Ins. Co.* (*Malone*) (1989) 215 Cal.App.3d 275, 277 [263 Cal.Rptr. 499].)

▮ Thus, the offset provisions found in subdivision (p)(4) and (p)(5) comprise the foundational pillars for determining the amount of underinsurance coverage once underinsurance coverage is triggered in accordance with subdivision (p)(2). It is in this light that we must construe the words of subdivision (p)(4) and (p)(5).

Those words, again, state in pertinent part that an underinsurance carrier's maximum liability "shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury" (subd. (p)(4)); and that an underinsurance carrier "paying a claim . . . shall, to the extent of the payment, be entitled to reimbursement or credit in the amount received by the insured from the owner or operator of the underinsured motor vehicle or the insurer of the owner or operator." (Subd. (p)(5).)

Citing certain decisions and statutes which acknowledge that "the insured" refers to a particular insured while "a," "an," or " 'any' insured" refers to all insureds, State Farm argues that the term "the insured" in subdivision (p)(4) and (p)(5) means precisely that—one particular insured. (See *California State Auto. Assn. Inter-Ins. Bureau* v. *Warwick* (*Warwick*) (1976) 17 Cal.3d 190, 193-194 [130 Cal.Rptr. 520, 550 P.2d 1056]; *National Union Fire Ins. Co.* v. *Lynette C.* (*Lynette C.*) (1991) 228 Cal.App.3d 1073, 1079 [279 Cal.Rptr. 394]; *Allstate Ins. Co.* v. *Condon* (*Condon*) (1988) 198 Cal.App.3d 148, 152-154 [243 Cal.Rptr. 623]; *Allstate Ins. Co.* v. *Gilbert* (9th Cir. 1988) 852 F.2d 449, 453-454; *American States Ins. Co.* v. *Borbor by Borbor* (*Borbor*) (9th Cir. 1987) 826 F.2d 888, 894; *Arenson* v. *Nat. Automobile & Cas. Ins. Co.* (*Arenson*) (1955) 45 Cal.2d 81, 83-84 [286 P.2d 816]; § 11580.1, subd. (c)(8).) Consequently, State Farm contends that these two subdivisions focus on individual insureds and that Hill, who has not received any of the underinsured tortfeasor's (Peralsky's) liability proceeds, is entitled to the per person limit of $25,000 out of the $30,000 that "remains" under Farley's underinsurance policy with Viking. Since it would have been simple, State Farm argues, for the Legislature to say "the insureds" or "any insured" in place of "the insured" in subdivision (p)(4) and (p)(5), the Legislature's intent must align with State Farm's interpretation. Consistent with its argument, State Farm notes the Legislature did not intend that an underinsurance carrier's per accident limit, as opposed to its per person limit, would be reduced by these offset provisions.

Although State Farm's argument has an initial appeal, on closer examination we discover its allure is only cosmetic.

Standing most prominently in the way of State Farm's position is the fundamental purpose of California's underinsurance scheme detailed above. Against this backdrop, State Farm's interpretation of subdivision (p)(4) and (p)(5) would cause nothing short of a coronary thrombosis to the heart of California's underinsurance system. Under State Farm's interpretation, there simply would be no offset for the per accident situation. This would be directly at odds with a system defined as being of the "offset" variety (*Fagundes*, *supra*, 2 Cal.App.4th at p. 1315) and whose "foundation" is based on offset. (*Macri*, *supra*, 4 Cal.4th at p. 328.)

When we invoke numbers rather than just words, we arrive at the same conclusion: State Farm's interpretation violates the fundamental purpose of California's underinsurance system, which is to provide the insured with the same insurance protections he would have enjoyed had the underinsured tortfeasor carried liability limits equal to the insured's underinsurance limits.

(*Rudd, supra,* 219 Cal.App.3d at pp. 954-955.) If Peralsky's per accident liability limits of $30,000 could not be offset against Viking's per accident underinsurance limits of $50,000, those insured under the Viking policy would be in a better position than they would have occupied had the tortfeasor, Peralsky, been insured in the amount of the Viking policy. Had Peralsky carried $50,000 in per accident liability limits, she would not be considered an underinsured motorist in this case and there would be no proceeds available under Viking's $50,000 per accident underinsurance policy; in this scenario, the occupants of the Farley vehicle could look only to Peralsky's $50,000 per accident liability limits. (Subd. (p)(2); *Messinger, supra,* 232 Cal.App.3d at pp. 513-518.) The goal of California's underinsurance system, as applied to the facts before us, is to place those requesting underinsurance coverage from Viking in the same position they would have occupied had Peralsky carried per accident liability limits of $50,000. But State Farm's interpretation would place these individuals in a better position. Under that interpretation, there would be $80,000 in available coverage: $30,000 from Peralsky; $20,000 already tendered by Viking; $25,000 in per person limits under the Viking policy for Hill; and $5,000 still remaining under Viking's per accident underinsurance limit of $50,000.

Furthermore, State Farm's interpretation falters when we examine the term "the insured" in subdivision (p)(4) and (p)(5) in the context of the definition of "insured" in subdivision (b). That definition is quite inclusive, encompassing as pertinent here "the named insured . . . and any other person while in or upon or entering into or alighting from an insured motor vehicle . . . ." Under this definition, underinsurance coverage runs to all of the occupants of a car with such coverage. As such, if there is only one injured insured in that car seeking underinsurance coverage, "the insured" in subdivision (p)(4) and (p)(5) means only one person, and the focus is on the per person limits of the tortfeasor's liability coverage and the injured insured's underinsurance coverage. If there is more than one injured insured seeking underinsurance coverage, "the insured" in subdivision (p)(4) and (p)(5) means more than one person, and the focus is on the per accident limits of the respective policies. The analysis is similar if the insurance policy has just a single-limit (i.e., not divided into per person/per accident, but simply one lump-sum limit). (See *Malone, supra,* 215 Cal.App.3d at pp. 279-280.) Thus, under subdivision (p)(4) and (p)(5), the term "the insured" is a versatile one consistent with the inclusive definition of "insured" in subdivision (b) and the fundamental purpose of underinsurance coverage in California.

This statutory language is in contrast to another statute, section 11580.1, subdivision (c)(8), to which State Farm directs our attention. Section

11580.1 governs the required and optional provisions for automobile liability insurance. Subdivision (c)(8) of that section expressly defines the term "the insured" in the context of subdivision (c) to mean a particular insured, and the term "an insured" to mean any insured under the policy. We fail to see how section 11580.1, subdivision (c) helps State Farm. Rather, it supports our view that these terms must be read in the context and purpose of their respective statutes.[4] A similar focus on context and purpose is true for insurance policies using the terms "the insured" or "any insured." (See *Lynette C., supra,* 228 Cal.App.3d at p. 1079; *Condon, supra,* 198 Cal.App.3d at pp. 152-154; *Gilbert, supra,* 852 F.2d at pp. 453-454; *Borbor, supra,* 826 F.2d at p. 894; *Arenson, supra,* 45 Cal.2d at pp. 83-84.)

State Farm also argues that our interpretation of subdivision (p)(4) and (p)(5) allows an underinsurance carrier to take a double credit in the multiple claimant context: first from the insured who receives payment from the tortfeasor and then again as to all other insureds when the credit is applied against the per accident limit. We do not agree. State Farm's argument improperly combines a per person and a per accident analysis. However, the two are distinct for basic credit purposes. If there is only one injured insured, the per person limits and offset apply. If there is more than one injured insured, the per accident limits and offset apply.[5] In related fashion, State Farm argues that, in essence, the underinsurance per accident limit is being reduced not by the amount paid by the underinsurance carrier, but by the amount which the carrier does not have to pay. We fail to see any problem in this regard. Indeed, the per accident amount an underinsurance carrier is obligated to pay in a multiple claimant context is reduced (i.e., offset) by the amount paid by the underinsured tortfeasor—that is, by the amount the

---

[4]In a related vein, State Farm cites subdivisions (e) and (h) of section 11580.2, which allow for reductions in uninsurance coverage if "the insured" or "any person" has amounts available to him or her through automobile medical payment insurance (subd. (e)) or worker's compensation (subd. (h)). (In the context of a single insured claimant, the subdivision (h) reduction has been interpreted to apply to underinsurance coverage as well. (*Rudd, supra,* 219 Cal.App.3d 948.).) State Farm claims that any definition of "the insured" based on subdivision (b) should entail logically consistent results throughout section 11580.2. State Farm notes, however, that there is no sensible way to apply the reductions in subdivisions (e) and (h) except on an individual insured basis. That may be true for those particular reductions in the context of multiple claimants although we do not express any views on these issues because they are not implicated in this case. We do note, however, that our interpretation of the term "the insured" in the offset provisions of subdivision (p)(4) and (p)(5) is the most sensible way to further the fundamental purpose of the California underinsurance system. And we reiterate the versatile nature of the definition for "insured" in section 11580.2, subdivision (b), and the importance of applying that definition in the context of the fundamental purpose of section 11580.2, subdivision (p).

[5]A particular insured in the per accident context may still be subject to the per person limit within that context.

underinsurance carrier does not have to pay. That is the whole point of an offset.

Thus, our interpretation of the term "the insured" in section 11580.2, subdivision (p)(4) and (p)(5) accords with the fundamental purpose of underinsurance coverage in California, the definition of "insured" in subdivision (b), and the principle of underinsurance running to all of the persons occupying a vehicle. It also accords with our high court's approval in *Macri* of the language in *Malone* that " '[a]s the statutory scheme is designed, the underinsured motorist carrier gets a dollar-for-dollar credit for all payments by third party tortfeasors to the insureds, whether the insureds are made whole or not. In other words, a carrier providing underinsured motorist benefits *never* pays the full amount, only the difference between the policy limits and all contributions by all tortfeasors to all insureds.' "[6] (*Macri, supra,* 4 Cal.4th at p. 328, quoting *Malone, supra,* 215 Cal.App.3d at p. 277; italics in original.) Finally, it accords with the triggering mechanism which determines whether underinsurance coverage applies at all—this mechanism focuses not on the amount of the injured insured's damages or on the proceeds available to each injured insured, but on a comparison of the tortfeasor's bodily injury liability limits with the injured insured's underinsurance limits. (Subd. (p)(2); *Messinger, supra,* 232 Cal.App.3d at p. 521.)[7]

We conclude that, under the California underinsurance statutory scheme, Viking can claim a credit of $30,000 against its $50,000 per accident underinsurance exposure.[8]

---

[6]Neither *Malone* nor *Macri* involved multiple insureds like this case.

[7]Diligently, State Farm points to footnotes 5 and 9 in *Messinger* to argue that this court has hinted that the proper setoff focus in a multiple claimant per accident underinsurance context is on the amount received by individual insureds rather than on the amount received by all insureds. In footnote 5, *Messinger* noted that the underinsurance triggering and setoff statutes in New Jersey are similar to those in California. (232 Cal.App.3d p. 518, fn. 5.) In footnote 9, while expressly declining to state any views on the setoff issue, *Messinger* cited as an example of that issue a case from New Jersey: *Filippatos* v. *Selective Ins. Co.* (1990) 241 N.J.Super. 236 [574 A.2d 1002]. (232 Cal.App.3d at p. 522, fn. 9.) Although some of the California and New Jersey statutory provisions are similar, as recognized in footnote 5, they are not identical; as the trial court in this case noted, the setoff provision in New Jersey, which was applied in *Filippatos* more in line with State Farm's interpretation here, is clearer than subdivision (p)(4) and (p)(5) because it focuses on "an injured person" rather than on "the insured." As for footnote 9, the trial court has it right again: *Messinger's* express refusal to state a position on the setoff issue should not be read as an endorsement of the *Filippatos* holding to the California situation.

[8]We deny Viking's request to take judicial notice of legislative staff memoranda and letters for the purpose of showing the Legislature's intent in enacting the underinsured motorist provisions.

## 2. *The Viking Insurance Policy*

Simply because the statutes allow Viking to claim this $30,000 credit does not mean that its insurance policy with Farley allows it to do so. Because an insurance company may provide coverage which exceeds statutory guidelines, we must look to the language of the policy to determine whether it provides for the credit in question. State Farm claims the policy is ambiguous on this point and therefore must be construed against Viking. We disagree.

"Words used in an insurance policy are to be interpreted according to the plain meaning which a lay[person] would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists. [Citations.]" (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) "[A]ny ambiguity in language must be resolved against the insurer. [Citation.]" (*Arenson, supra,* 45 Cal.2d at p. 83.) And clauses limiting coverage are construed strictly against the insurer and liberally in favor of the insured. (*Id.* at p. 83; 30 Cal.3d at p. 808.)

The relevant provisions in the Viking policy are as follows. Under a bold-faced heading entitled "Payment Of Damages," the policy provides in pertinent part that "[a]ny amount payable under this insurance will be reduced by the amount paid by or on behalf of anyone responsible for *your* injury or property damage." Under a bold-faced heading entitled "Limits of Uninsured/Underinsured Motorist Insurance," the policy states in pertinent part: "The limit of uninsured/underinsured motorist insurance shown on the declarations page for 'each person' is the maximum we'll pay in *damages* for bodily injury to any one person. The maximum we'll pay in *damages* for bodily injury to two or more persons is the amount shown on the declarations page for 'each accident.' . . . [W]e will pay no more than these limits no matter how many persons may be protected under this insurance, or claims, claimants or vehicles are involved. [¶] The limit of liability will be reduced by the amount recovered or recoverable from, or on behalf of, the owner or operator of an uninsured/underinsured *motor vehicle.*"

Aside from the reduction for the amount "recoverable from" the underinsured motorist, these policy provisions are clear and in accord with the interpretation of section 11580.2, subdivision (p)(4) and (p)(5) set forth above. Under these policy provisions, the amount of underinsurance paid to a particular insured will be reduced by the amount collected from anyone responsible for that insured's injury. If there are two or more injured

insureds, as is the case here, the *per accident limit of liability applies regardless of the number of insured claimants*, and *this limit* will be reduced by the amount recovered from the underinsured motorist. It would be a strained interpretation to conclude that the reduction in the per accident limit of liability—a limit that necessarily encompasses two or more injured insureds—focuses only on particular insureds and does not account for the amount recovered by the other insureds injured in the accident.

However, the reduction in the limit of liability for the amount "recover-*able* from" (as opposed to "recover*ed* from") the underinsured motorist cannot be squared with the language of section 11580.2, subdivision (p)(4) and (p)(5). The offsets allowed under subdivisions (p)(4) and (p)(5) are only for those amounts "paid to the insured" or "received by the insured" from legally liable parties. These offsets do not include amounts "recoverable from" the underinsured motorist.

Aside from the invalid phrase "recoverable from," the Viking underinsurance provisions noted above are clear and legally proper.

### DISPOSITION

The judgment is affirmed.

Scotland, J., and Raye, J., concurred.